41 C.C.P.A.(Customs)
## HENRY CLAY AND BOCK & CO., Ltd. v. UNITED STATES.

Patent Appeals No. 4724.

United States Court of Customs and Patent Appeals.

June 3, 1953.

Worley, J., dissented.

John R. Rafter, New York City, for appellant.

Charles J. Wagner, Acting Asst. Atty. Gen., of N. Y. (Richard E. FitzGibbon, Sp. Atty., New York City, of counsel), for the United States.

Before GARRETT, Chief Judge, and O'CONNELL, WORLEY, COLE, and JACKSON (retired), Judges.

COLE, Judge.

The United States Customs Court, Third Division, affirmed the action of the Collector of Customs at Philadelphia in denying refund of duties on tobacco wastes destroyed under customs supervision. This appeal is from the judgment therein. (C. D.1377).

The appeal was originally argued before this court on December 10, 1952, and on January 14, 1953, we rendered our decision which reversed the judgment of the United States Customs Court. Appellee filed a petition for rehearing within the statutory period. The petition was granted and argument was had thereon April 16, 1953.

These are the facts: Paragraph 601 of the Tariff Act of 1930, 19 U.S.C.A. § 1001, par. 601, was invoked by the collector in classifying and assessing the shipment. The tobacco being imported from Cuba, the preferential of 20 percent of the 35 per centum rate was allowed.

The appellant bases his claim for refund on section 311 of the Tariff Act of 1930, as amended, or under sections 557 and 558 of such act, and the last provision of section 315 of said act. All were denied by the Customs Court.

The entire factual basis for the litigation was entered through stipulation comprising fifteen printed pages. Much of it is not essential for our purposes. We find this summation thereof in the opinion below to be sufficient and accurate:

"That the plaintiff herein is engaged in the manufacture of cigars in the United States and has been so engaged since 1932; that since 1933, it has operated a class 6 bonded manufacturing warehouse for the manufacture, for home consumption, of cigars made entirely of Cuban tobacco; and for that purpose imported from Cuba unstemmed leaf tobacco, both wrapper and filler, and stemmed filler tobacco. That prior to the transfer of the tobacco in suit to said bonded manufacturing warehouse, duties were paid thereon on its imported weight. That in processing said tobacco into cigars, in said bonded manufacturing warehouse, certain wastes were incurred, namely, cuttings, pieces, and particles of various sizes, which were put through a power-driven cutting machine, screened, according to size, into three categories, viz., scrap, picadura, and dust; that the scrap and picadura consisted of relatively large and small scraps, respectively, of tobacco, and were tobacco wastes or by-products which had a tobacco use; and that the dust was a tobacco waste which was not used in the manufacture of cigars or any other tobacco product. That in said processing, another tobacco waste was incurred, viz., sweepings, which consisted of all kinds of tobacco wastes that were either swept from the floors or removed from the machines when the machines were being cleaned; and that said waste was not used in the manufacture of cigars or other tobacco product. That these wastes were

destroyed under customs supervision and in compliance with customs regulations.

"That in 1935, under a ruling of the Treasury Department, regulations were promulgated directing collectors of customs to make allowance in the liquidation of entries of tobacco manufactured into cigars in a bonded (class 6) warehouse, for the exportation or destruction under customs supervision of stems and other tobacco wastes derived from tobacco imported from any one country.

"That pursuant to said ruling, such allowances were in fact made between 1935 and 1948, at which time the practice was discontinued, pursuant to instructions of the Secretary of the Treasury, without any previous notice to importers or owners of the tobacco.

"That during the years between 1935 and 1948, this plaintiff had received such refunds under said ruling.

"That by letter to the plaintiff under date of February 6, 1948, the collector of customs at the port of Philadelphia denied plaintiff's request for a refund in this case, which request was denied pursuant to instructions of the Secretary of the Treasury dated January 28, 1948. (Copies of the request and the denial embodying the instructions of the Secretary were admitted in evidence as exhibits 3 and 4.)

"That if such refunds are allowable, the rates and amounts of duties applicable thereto are correctly stated on the first page of 'Abstract of Manufacturing Records and Entry for Refund of Duty' herein.

"That all regulations as to the identity of the wastes destroyed were complied with by the plaintiff as to the entries involved in this litigation."

Sections 311, 557 and 558, supra, which are deemed pertinent, read:

Section 311. "Articles manufactured under these provisions may be withdrawn under such regulations as the Secretary of the Treasury may prescribe for transportation and delivery into any bonded warehouse at an exterior port for the sole purpose of immediate export therefrom: *Provid-*

*ed,* That cigars manufactured in whole of tobacco imported from any one country, made and manufactured in such bonded manufacturing warehouses, may be withdrawn for home consumption upon the payment of the duties on such tobacco in its condition as imported under such regulations as the Secretary of the Treasury may prescribe, and the payment of the internal-revenue tax accruing on such cigars in their condition as withdrawn, and the boxes or packages containing such cigars shall be stamped to indicate their character, origin of tobacco from which made, and place of manufacture."

Section 557. "Entry for warehouse; Warehouse period; drawback

\* \* \* \* \* \*

"(c) Merchandise entered under bond, under any provision of law, may, upon payment of all charges other than duty on the merchandise, be destroyed, at the request and at the expense of the consignee, within the bonded period under customs supervision, in lieu of exportation, and upon such destruction the entry of such merchandise shall be liquidated without payment of duty and any duties collected shall be refunded."

Section 558. "No remission or refund after release of merchandise

"(a) No remission, abatement, refund, or drawback of estimated or liquidated duty shall be allowed because of the exportation or destruction of any merchandise after its release from the custody of the Government, except in the following cases:

\* \* \* \* \* \*

"(3) When articles entered under bond, under any provision of law, are destroyed within the bonded period as provided for in section 557 of this act, or are destroyed within the bonded period by death, accidental fire, or other casualty, and proof of such destruction is furnished which shall be satisfactory to the Secretary of the

Treasury, in which case any accrued duties shall be remitted or refunded and any condition in the bond that the articles shall be exported shall be deemed to have been satisfied."

The latter two sections of the Tariff Act of 1930, as above set out, have been amended by the Customs Administrative Act of 1938.

Regarded also as pertinent is section 15.4 of the Customs Regulations of 1943, under the provisions of which the ruling of the Treasury Department in effect between 1935 and 1948, and to which we have hereinbefore referred, was in effect. It reads as follows:

"(a) Applications for the abandonment or destruction of merchandise in bond pursuant to section 563(b) or 557 (c), Tariff Act of 1930, as amended, shall be filed with the collector by the consignee or his duly qualified representative on customs Form 3499, in duplicate, with the title modified to read 'Application and Permit to Abandon (or Destroy) Goods in Bond.' When an application is for permission to destroy, the proposed method of destruction shall be stated in the application and be subject to the approval of the collector. No application to abandon or destroy warehoused merchandise shall be approved unless concurred in by the warehouse proprietor."

Admittedly, the appellant complied literally with the provisions of the law at the time the tobacco in question was imported, and under section 311, supra, the full duty requirements were met. The shipment was lodged in the bonded warehouse under the complete supervision of the Government personnel in charge thereof. It is also conceded that the provisions of regulation 15.4, supra, were accepted as applicable to section 557, supra, and that from 1935, continually until 1948, duties collected on merchandise such as here involved, entered under bond and later destroyed, were refunded. The Treasury Department found it advisable to require applications therefor to come

under 15.4 as was done. It will be seen therefore that prior to the revocation by the Treasury Department of this practice, the appellant had complied with every applicable provision of the law and existing regulations. As a result thereof, the Government granted the request to first, recognize a certain quantity of the imported tobacco as waste and secondly, to admit the importer's right to refund of duty previously paid thereon.

Just how the earlier practice was terminated is pertinent because, as a result thereof, it will be observed that the right which we believe the appellant enjoys because of what had transpired prior thereto, is all the more emphasized. On October 29, 1946, when the regulations to which we refer were in effect, the appellant addressed this communication to the Collector of Customs in Philadelphia:

"Application is hereby made to destroy during the month of November under Section 15.4 Customs Regulations 1943 (by sprinkling with kerosene) tobacco stems, dust, picadura, cuttings, and waste producted from Leaf Tobacco withdrawn duty paid for transfer into the Domestic Section of our Class #6 Warehouse Factory #1 at Grand Street and Virginia Avenue, Trenton, N. J. Said destruction to be made at our risk and expense. *The destroyed tobacco wastes will be accounted for in our report as of November 30, 1946.*" (Italics ours.)

Indorsed thereon is this statement over the signature of the deputy collector:

"Granted and referred to the Storekeeper in charge at the above described warehouse who will supervise the destruction of the tobacco wastes and report his action below, *specifying the quantity of each kind of waste destroyed.*" (Italics ours.)

Shortly thereafter, November 30, 1946, the United States storekeeper, in response to the foregoing approval, sent this certification to the Collector of Customs in Philadelphia:

"I hereby certify that the following described *tobacco wastes have been destroyed,*

by sprinkling with kerosene, *under my supervision*: (Italics ours.)

| | Wet Lbs. | Moisture | Dry Lbs. |
|---|---|---|---|
| Tobacco Stems | 4913 | Less 17.3% | 4063 |
| Dust — None | | | |
| Rings | | | 135 |
| Sweepings | | | 1065 |
| | | | 5263 C.F.B. |

F. C. Thompson
U.S. Storekeeper"

The mechanical computation in dollars and cents of the duties refundable does not appear in the record, but it is known that the money has never been actually paid. That fact does not affect our conclusion herein. For reasons not disclosed, the payment was made the subject of a refusal order dated February 6, 1948, from the Acting Collector of Customs, which letter reads:

"I have to inform you that *your application* presented to this office October 29, 1946 *to destroy under customs supervision and, thereafter, for refund of customs duties* on certain stems and wastes produced from duty-paid wrapper tobacco and duty-paid filler tobacco in your Class 6 customs bonded cigar manufacturing warehouse, *as itemized in detail* in your sworn abstract of manufacturing records for the period *November 1, 1946 to November 30, 1946, is denied,* pursuant to instructions of the Secretary of the Treasury under date of January 28, 1948." (Italics ours.)

This denial order, issued pursuant to instructions of January 28, 1948 from the Secretary of the Treasury, reads as follows:

"Reference is made to the Bureau's teletype of November 6, 1947 (734), directing you to *suspend the certification for payment of any claims for refunds of duty* in connection with the destruction under section 557(c), Tariff Act of 1930, as amended, of *tobacco stems and wastes* incurred in customs bonded cigar manufacturing warehouses established pursuant to section 311, Tariff Act of 1930, as amended.

"You shall immediately *formally deny in writing all pending claims for such refunds and shall take similar action in the case of such claims filed in the future."* (Italics ours.)

It is clear from the foregoing that the letter of February 6, 1948, *supra,* should not be accepted as sufficient to defeat and completely destroy rights which the appellant had acquired prior thereto, such as clearly exist in this case. The letter refers to the application of October 29, 1946, and mentions specifically the purpose of said application to destroy under customs supervision—exactly what was done—and to thereafter refund customs duties as itemized in detail in a sworn abstract of the manufacturing records for the period November 1, 1946 to November 30, 1946, the exact date specified in the initial request by the appellant to the collector under date of October 29, 1946. This suggests very definitely that the collector possessed, at the time the February 6th letter was written, a complete itemized statement in detail of the quantity of tobacco actually destroyed as waste, leaving nothing to be done further, if such procedure had continued in practice, but the payment of the computed refund thereunder.

As to the rights acquired by an importer under circumstances quite similar to those in the instant case, Campbell v. United States, 107 U.S. 407, 2 S.Ct. 759, 27 L.Ed. 592, is strong authority. That case involved a question of drawback, and has been widely cited. As late as Romar Trading Co., Inc. v. United States, 27 Cust.Ct. 34, 37 (decided July 6, 1951), a case involving a question of drawback, the court referred to the Campbell decision in this way:

"* * * In the Campbell case the claimant for drawback was shown to have complied with all applicable provisions of law and all applicable regulations prescribed by the Secretary of the Treasury under authority of law in order to obtain drawback upon certain exported linseed oil cake manufactured in the United States with the use of imported duty-paid linseed, but the collector of customs, upon instructions of the Secretary of the Treasury, refused to certify the amount

to which the claimant was entitled as drawback, and consequently payment was not made. It will be noted that in that case all of the acts required by the law and regulations to be done by the claimant in order to entitle him to drawback had been done, so that what was at stake was the claimant's *right to receive payment,* not a right to export with benefit of drawback. Having done everything that the law and the regulations required to be done, the claimant had a right to receive payment, and the court held that this could not be defeated by the refusal of the Secretary of the Treasury or the officers of the customs to act in the matter. * * *" (Italics quoted.)

It can be likewise said in this case that the appellant complied with all requirements of law and regulations and, acting thereunder, the Government officials directed and approved the absolute total destruction of the tobacco involved, such property thereafter ceasing to exist, and in so doing nothing remained to be done except that the claimant had a right to receive payment.

The principle laid down in the Campbell case, supra, seems to us to be applicable despite the fact that the instant case does not present decisions by Government employees acting in their official capacity under authority of statutory provisions alone, as distinguished from presumed statutory authority augmented by rules and regulations interpreting the same.

That was the view we took in an earlier opinion which was put aside for this decision following reargument of the entire case. While we adhere thereto, we adopt the following, advanced by counsel for the appellant during reargument as presenting even stronger reasons for its appeal to succeed.

The involved statute is not free from difficulty in construing the same. As stated by appellee in its brief, "It is the appellant's position that the words 'such tobacco' used in the 'cigar proviso' of section 311 refer to only the amount of the imported tobacco as finally appears in the cigars as they are withdrawn for home consumption. On the other hand, the Government contends that those words, to wit, 'such tobacco' have as their antecedent the term 'tobacco imported from any one country' and therefore refer to all of the tobacco imported in its quantity and condition as imported."

Government counsel then aptly argues: "Since, therefore, there seems to be an ambiguity arising from the terms used in the statute, an examination of the legislative history of the 'cigar proviso' is indicated."

While a study of the Congressional intention that section 311, supra, presents may become of importance in future litigation, we do not regard it as at all necessary for our purposes here.

The law is clear that when the Government over a long period of time construes an ambiguous statute, such as we believe section 311 to be, and applies such construction through decisions which are later changed, then rights acquired prior to such a change cannot be affected retroactively or benefits received as a result thereof, required to be returned.

In support of this well recognized principle of law, the case of United States v. Alabama Great Southern Railroad Company, 142 U.S. 615, 12 S.Ct. 306, 308, 35 L.Ed. 1134, is a leading authority. In that case, the appellee operated a railroad running through portions of four states. The Government had aided appellee's line by land grants covering a considerable part of the road in two of the states on condition that the United States mails be carried over the road under the direction of the Post Office Department at such rates as Congress would, by law, direct. Pending Congressional action in establishing such rates, it was provided that the Postmaster General should determine the price. Thereafter, Congress passed an act "That rail-road-companies whose railroad was constructed in whole or in part by a land-grant made by Congress on the condition that the mails should be transported over their road at such price as Congress should by law direct shall receive only eighty

per centum of the compensation authorized by this act." 19 Stat. 82. In construing this statute, the Postmaster General determined that the reduced rate was applicable only to that part of the road which had been aided by land grants. This construction of the statute remained in force for nine years through the tenure of six different Postmasters General during six different administrations of the Post Office Department, and the appellee (and its predecessor) was paid in accordance with that established practice. At the end of the nine year period, however, the then incumbent Postmaster reviewed the statutory provision and reversed the construction placed thereon by his predecessors in office, ruling that a proper interpretation required payment of the reduced rate over the whole of the appellee's line. In holding that the statute setting forth the eighty per centum rate was ambiguous in its terms, the court decided that the Postmaster's decision could have no retroactive application and repayment of alleged excessive rates could not properly be demanded from appellee. The court said:

"We think the contemporaneous construction thus given by the executive department of the government, and continued for nine years through six different administrations of that department,—a construction which, though inconsistent with the literalism of the act, certainly consorts with the equities of the case,—should be considered as decisive in this suit. It is a settled doctrine of this court that *in case of ambiguity the judicial department will lean in favor of a construction given to a statute by the department charged with the execution of such statute, and, if such construction be acted upon for a number of years, will look with disfavor upon any sudden change,* whereby parties who have contracted with the government upon the faith of such construction may be prejudiced. * * *"   (Italics ours.)

 Taking this view, which we consider sufficient for the appellant to recover, there is obviously no need for dis-cussion of the other questions raised herein.

For the reasons hereinbefore stated, the judgment of the United States Customs Court is *reversed and remanded* for further proceedings in conformity with this decision.

Reversed and remanded.

WORLEY, J., dissents.

JACKSON, J., retired, recalled to participate herein in place of JOHNSON, J.